IN THE MATTER OF F. LEE BAILEY, AN ATTORNEY AT LAW OF THE COMMONWEALTH OF MASSACHUSETTS.

Argued January 12, 1971—Decided February 8, 1971.

*Mr. Harold N. Springstead* argued in support of the order.

*Mr. Monroe L. Inker,* of the Massachusetts bar and *Mr. F. Lee Bailey, pro se,* argued the cause for respondent.

PER CURIAM. Respondent is a member of the Massachusetts bar who was admitted *pro hac vice* (*R.* 1:21–2, formerly *R. R.* 1:12–8) to represent, in the trial court, certain defendants who had been indicted for murder in two highly publicized cases pending in Passaic County. This permission was revoked by the trial judge before trial because of respondent's actions. We affirmed the revocation. *State v. Kavanaugh,* 52 *N. J.* 7 (1968), *cert. den. sub nom. Matzner v. New Jersey,* 393 *U. S.* 924, 89 *S. Ct.* 254, 21 *L. Ed.* 2d 259 (1968). See also *Matzner v. Brown,* 288 *F. Supp.* 608, 612 (D. N. J. 1968), *affirmed* 410 *F.* 2d 1376 (3rd Cir. 1969),

*cert. den.* 396 *U. S.* 1015, 90 *S. Ct.* 570, 24 *L. Ed.* 2d 506 (1970). Subsequently we issued an order that respondent show cause why he should not be barred from further practice *pro hac vice* in the State of New Jersey or otherwise disciplined on the basis that the same events constituted unethical conduct.

The matter was referred for hearing to Judge Morris Pashman of the Superior Court as a Master, to act as and with all the powers conferred upon an Ethics Committee, under the inherent authority of this court by virtue of its exclusive jurisdiction over admission to the practice of law and the discipline of persons admitted. *Const.* 1947, Art. VI, sec. II, par. 3. See *In re Krieger,* 48 *N. J.* 186, 191–193 (1966). The then Prosecutor of Bergen County, or such assistant as he might designate, was assigned to prosecute the proceeding. Pursuant thereto he prepared and served a statement of charges in six counts to which respondent filed a full answer. The trial of the charges was postponed until after the murder indictments had been finally disposed of, so that there might be no possible prejudice to the defendants therein, even though the disciplinary matter was to be heard *in camera.* The hearings, when held, were thoroughly adversary in nature with a complete presentation of evidence and legal contentions. The defense was vigorous and included jurisdictional and constitutional issues as well as attempted justification of what respondent had done.

Judge Pashman thereafter filed his report and findings of fact. He found respondent guilty of unethical conduct on the first count of the charges but not guilty on the remaining five. We thereupon brought that finding before us for disposition by the present order directing respondent to show cause why he should not be disciplined for the conduct concerning which the Master had found guilt.

Respondent did not file any brief with us. At oral argument his counsel stated that a full and fair hearing had been had before Judge Pashman. Counsel and he took the position that the findings were adequately substantiated by the

proofs and the applicable law and that they did not dispute them in any respect. This included an assumption of responsibility for the specific conduct complained of in the first count and its result, and of its improper and unethical character. They expressly narrowed the issue before us to the matter of what sanctions, if any, shall be imposed, in connection with which expressions of apology and apparent contriteness were made. The position taken amounted to an abandonment of all defenses other than factors in mitigation. We consequently treat the matter accordingly.

In order to reach an appropriate conclusion, reference must be made to the facts of the guilty conduct. Respondent was charged in the first count with violation of Canon 20 of the Canons of Professional Ethics which reads:

> Newspaper publications by a lawyer as to pending or anticipated litigation may interfere with a fair trial in the Courts and otherwise prejudice the due administration of justice. Generally they are to be condemned. If the extreme circumstances of a particular case justify a statement to the public, it is unprofessional to make it anonymously. An ex parte reference to the facts should not go beyond quotation from the records and papers on file in the Court; but even in extreme cases it is better to avoid any ex parte statement.

See also *State v. Van Duyne,* 43 *N. J.* 369 (1964), *cert. den.* 380 *U. S.* 987, 85 *S. Ct.* 1359, 14 *L. Ed.* 2d 279 (1965).

The misconduct alleged was the sending of copies of a letter, addressed by respondent to the Governor of New Jersey under date of April 24, 1968, to 150 or more state and federal legislators and public officials and others "which he knew or had reason to know would be disseminated to news reporting media and thereafter to the public." In fact, the letter reached the press before it even arrived at the Governor's office and was published at once.

The letter, reproduced in full in *State v. Kavanaugh,* *supra* (52 *N. J.* at 9–10), was written and circulated close to the trial date of the first of the murder indictments, which involved one of respondent's clients. Its salient statements may be summarized:

1. Witnesses for the State were convicts and persons utterly without human value; they had been pressured or bribed to give their stories; and the Prosecutor knew that they intended to lie and give a fully fictional account.

2. Respondent opined that all defendants were completely innocent.

3. All defendants had been cleared by polygraph tests administered by nationally known experts.

4. Special counsel engaged to try the cases for the prosecution had determined that the alleged eyewitness in one of the cases had offered a completely perjured story and that he had been assisted in its concoction by state officials.

5. Special counsel wished the dismissal of the indictment about to be tried for this reason, but representatives of the Prosecutor had contacted the witness, who thereupon reverted to his false story, and the State proposed to go forward with the trial in order that these officials, "guilty of felonious conduct," would be protected. "My client, therefore, is offered the opportunity to fall into the classic American syndrome of the damnation of an acquittal. I do not propose that this should be allowed."

6. A request for an immediate investigation to determine whether special counsel was being forced by orders from superiors to offer in a courtroom a man he knew to be a complete and utter liar.

7. The press had been throttled to the extent that the public was almost wholly unaware of what is being perpetrated.

Respondent's expressed intention was that the entire matter be aired as soon as the trial jury was sequestered, but hoped that some action on the Governor's part "will precede such an unfortunate event."

Respondent's testimony before the Master clearly pointed to his true reasons for the wide circulation of the letter. They have at least two aspects. The first was to seek the exertion of political pressure upon the Prosecutor. The Master illustrated this in his report with quotations from respondent's testimony:

He spoke of "shaking loose * * * some politicians who were doing some outrageous things * * *." * * * He testified that he wanted to choose for mailing several legislators "who were directly concerned with matters of this nature from a legislative point of view and send them copies in order, very frankly, to keep the matter from being squelched." * * * The respondent further testified that he wanted potentially "strong people in the legislature who, frankly, were sufficiently politically opposed to the district attorney or county attorney in Passaic County so that they might go after them." * * * These statements and many others set this case in the public mind (and in the mind of prospective jurors) as an extraordinary case * * *.

Judge Pashman summed up this aspect of the letter: "This was a patent attempt to telegraph a set of facts unilaterally attacking witnesses, officials and the processes of government. An untrained layman (and thousands must have read this letter) is easy prey to this approach — especially when the trial is to be held shortly."

The second aspect is even more disturbing — an intent to somehow bring about a nonjudicial, pretrial determination by the public of his clients' innocence. This is the very question that a trial jury would have to decide. We again adopt the Master's language:

He truly wanted a "pretrial" trial of the truth of his allegations as the New Jersey Supreme Court stated. He unequivocally wanted to bring out at a "public hearing" before the trial all that he testified to before me and had written in his controversial letter. And this is his understanding of his constitutional rights as to pretrial publicity. Mr. Bailey is a firm believer in having the "people" hear his case in a "pretrial" trial and have them determine the truth of the allegations in the indictment. It is not clear how the "public" makes its decision known other than by "people [beginning] to call the officials that I had written to and say, 'Why didn't you do something about this'." * * * He refers constantly to a "public hearing." * * * The testimony is clear that the respondent believes he has the right to make the public a party to his "pretrial proceedings."

The Master quite correctly stated that, in order to find respondent guilty of the charge encompassed in the first count, he must decide, conceding respondent's right to address a private letter to the Governor or other appropriate

public official, "whether Mr. Bailey wrote the letter with the intention that it reach the news media or whether Mr. Bailey acted so recklessly and indifferently that there would exist a substantial certainty that the letter would reach the public domain." He concluded as follows:

Mr. Bailey's answers at the hearing reach out for and substantiate only one conclusion: that Mr. Bailey intended the letter of April 24, 1968 to be published and that this would be the beginning of his "public hearing." In addition to the fact that the letter violated [the trial judge's] orders, Mr. Bailey's communication helped in great measure to destroy the sense of fairness, dignity and integrity that all people associate with the courtroom. He should know that "what people say is what others reasonably hear and are meant to hear." The most sophisticated readers do not withhold judgment. And that would be the result when he beamed the April 24 letter to the public at large. Such judgment before trial is the antithesis of our judicial process. The facts of this hearing as developed in the testimony and a careful reading of the exhibits underscore that conclusion. The respondent unequivocally violated Canon 20 of the Professional Code of Ethics.

Although the factual and legal correctness of that conclusion is not disputed, we ought to say that we are in wholehearted accord with it.

This highly improper conduct cannot be allowed to pass without discipline. It indicates a state of mind, or so-called philosophy, that treats as justified, a course of action by a lawyer completely foreign to and destructive of our system of justice and the true responsibilities of an advocate. Judge Pashman expressed it this way in the final words of his report: "At that time — April 24, 1968 — I find that Mr. Bailey subscribed to the judgment that under certain circumstances, he had the right to go to the press regardless of the law and court directives. He intentionally did this."

This is not a case of the first indication or implementation of such a point of view by a beginner at the trial bar. Although admitted only slightly more than 10 years, respondent is a nationally publicized lawyer, especially in the field of criminal defense. The tactics involved here fit a pattern of past behavior. Less gross, but similarly motivated, actions

to secure favorable pretrial publicity for his clients in these murder cases (all discussed fully in the Master's report and some referred to in *State v. Kavanaugh, supra* (52 *N. J.* 7)) had occurred earlier, and had resulted in orders and warnings by the trial judge. Furthermore, he recently was found guilty of and censured by the judicial authority of his home state for the same type of misconduct occurring in 1964 in that state and in 1967 in Florida. (The Massachusetts proceeding also involved the conduct now before us with respect to which our findings and conclusions in *State v. Kavanaugh, supra,* were accepted without reservation). Mr. Justice Kirk of the Massachusetts Supreme Judicial Court said in his findings in that proceeding that from respondent's attitude "there has evolved * * *, consciously or unconsciously, a philosophy of extreme egocentricity for the defence of criminal cases involving the use of news media * * *," seeking "to create a force outside the courts with the expectation and intention that the force so created would produce a desired result in a particular case within the courts." So we cannot accept at full value his counsel's plea in mitigation that the circulation of the letter was the result of loss of emotional control in this particular case.

We will not, however, in assessing punishment, overlook the expressions of apology and contrition stated at oral argument. Although they did not specifically include a confession that his past philosophy is now recognized as wrong and assurances that such misconduct will never occur again, we trust, but cannot be positive, that such is and will be the case. We feel strongly obligated not only to impress this upon him by our conclusion here, but also to assure as best we can that he will not ever again stoop to such misbehavior, in this state at least.

We therefore conclude that respondent's privilege to apply for admission *pro hac vice* in any cause in any of the courts of this state shall be suspended for a period of one year from the date hereof. If after such period he applies to any court of this state for permission to appear *pro hac vice,* such

court shall inquire and be satisfied that he has not been guilty in the interim of any misconduct in any jurisdiction and that he will abide by the principles of professional ethics.

It is so ordered.

*For suspension for one year*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*Opposed*—None.