130 N.J. Super. 14 (1974)
324 A.2d 607
STATE OF NEW JERSEY, PLAINTIFF,
v.
CHARLES REDDY AND ROBERT REDDY, DEFENDANTS.
Superior Court of New Jersey, Law Division.
August 5, 1974.
*15 Mr. Richard L. Friedman for the State (Mr. Thomas F. Shusted, Prosecutor of Camden County, attorney).
Mr. Andrew G. Gay admitted pro hac vice, for defendant Robert Reddy (Mr. Michael A. Ferrara, Jr., of counsel).
Mr. John T. Grigsby, III, admitted pro hac vice, for defendant Charles Reddy (Mr. Michael A. Ferrara, Jr., of counsel).
KING, J.C.C. Temporarily Assigned.
This is a motion for a new trial following convictions of defendants Charles Reddy and Robert Reddy for murder in the first degree. On July 21, 1972, shortly before midnight, four men armed with a shot gun, two hand guns and assorted knives robbed the bartender of the Twilight Zone Cafe at Second and Beckett Streets in Camden, New Jersey. During the course of the robbery one of the patrons was shot and killed. About an hour after the robbery four men were apprehended by the police in North Philadelphia as a result of an all points bulletin. The vehicle being used by the four men at the time of arrest matched the description of the vehicle seen fleeing the scene of the crime by a patron of the bar. The cash proceeds of the armed robbery were found in the car, as well as several distinctive receipts which vendors had given the operator of the cafe on the day of the crime. Weapons fitting the description of the arms used at the scene were also found in the car. One of these weapons, a .38 police special, was later identified as the murder weapon by ballistic testing at the State Police Crime Laboratory. At the time the car was stopped and the four men arrested, defendant Robert Reddy *16 was the operator and defendant Charles Reddy was the occupant of the right-hand front seat. The back seat was occupied by Albert Locke and a fourth man. In this prosecution Charles Reddy and Robert Reddy were convicted of murder in the first degree and had been sentenced to life in prison prior to the return day of this motion. Approximately one year before the trial in this case on May 9, 1973 Locke pleaded guilty to the charge of murder and is presently serving a 20-30-year sentence in State Prison. The fourth man has not yet been tried and is still resisting extradition to this jurisdiction from the Commonwealth of Pennsylvania.
This trial commenced on Monday, May 20, 1974, with jury selection which lasted 1 1/2 days. On Tuesday, May 21, 1974, the trial continued with openings and the presentation of evidence. The evidence included proof that Locke and the fourth man were arrested with the Reddys and were seated in the back of the car when it was stopped by the police. On Wednesday afternoon an article appeared in the Camden Courier Post. The Courier is the leading local newspaper in the Camden County and Southern New Jersey area, with an average daily circulation of about 125,000 copies. The article related essentially the facts stated in the prosecutor's opening statement describing the offense and the manner of apprehension in Philadelphia shortly after the crime. Unfortunately, the article also disclosed that codefendant Locke, who was apprehended with the Reddy defendants while in the alleged "get away" car, had pleaded guilty to the murder charge on May 9, 1973:
In addition to the Reddy brothers, the policeman also arrested Albert Locke, 26, of the 500 block of S. 5th Street, and Robert Colclough, 27, of the 1700 block of Greene Street, both of Philadelphia.
Colclough is still in custody in Philadelphia, fighting extradition to New Jersey. Locke pleaded guilty to the murder on May 9, 1973. [Courier Post, May 22, 1974, page 71]
The jury had been cautioned about media exposure at the beginning of the trial, and the caution was periodically renewed. The jury was not sequestered and, of course, there was *17 a reasonable possibility of their exposure to the article. On Thursday morning, May 23, 1974, defense counsel brought the article to the court's attention in the form of a motion for a mistrial. The court heard the motion and reserved decision. At this point there was a very real possibility that Locke might testify for either the defendant or the State. If Locke did testify, the fact of his plea as well as the circumstances of his apprehension would have most likely been brought before the jury and the possible prejudicial effect of the article would have been obviated, with the safeguards of confrontation and cross-examination. In State v. Gardner, 54 N.J. 37 (1969), the court stated:
Because Gilchrist [a codefendant] testified in the instant case, and reiterated the evidence previously introduced through the testimony on his out-of-court oral admissions (including what the trial court had deleted), the Young [State v. Young, 46 N.J. 152] and Bruton [Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476] cases are inapplicable. * * * Gilchrist's decision to take the stand and testify on the subject matter of the oral admissions attributed to him subjected him to cross-examination by his co-defendants. It follows, therefore, that Gardner and Mason have been adequately afforded their Sixth Amendment right of confrontation, and any alleged error committed by the introduction of the oral admission was cured. * * * [at 44]
State v. Wade, 114 N.J. Super. 388 (App. Div. 1971), cert. den. 59 N.J. 269 (1971); State v. Gullo, 112 N.J. Super. 476 (App. Div. 1970); Nelson v. O'Neil, 402 U.S. 622, 91 S.Ct. 1723, 29 L.Ed.2d 222 (1971); United States v. Smith, 451 F.2d 595 (9 Cir.1971).
On Thursday, May 23, 1974, Locke was brought to the local County Jail from State's prison. He was interviewed by the prosecutor who declined to call him as a witness. On Monday, May 27, 1974, the prosecutor rested. After some debate defendants also declined to call Locke as a witness and Locke was then returned to State Prison. Defendants also declined to take the stand, offered one alibi witness, and rested on Tuesday morning, May 28, 1974. Since Locke did not testify, the necessity for ruling on the mistrial motion *18 made on Thursday, May 23, 1974, following the appearance of the offending article was impelling.
Courts previously faced with the publication of inadmissible material during the progress of the trial have consistently held that a refusal to poll the jury or to grant a motion for a mistrial was not error where the judge had instructed the jury during the trial to disregard media reports, had repeated the admonition in his charge, and particularly had found no evidence of any juror's actual reading of the material. State v. Curcio, 23 N.J. 521 (1957); State v. Cottone, 52 N.J. Super. 316 (App. Div. 1958), cert. den. 28 N.J. 527 (1959); State v. Petrucelli, 37 N.J. Super. 1 (App. Div. 1955), cert. den. 350 U.S. 1000, 76 S.Ct. 556, 100 L.Ed. 864 (1956); State v. Bentley Bootery Inc., 128 N.J.L. 555 (1942), aff'd 129 N.J.L. 386 (E. & A. 1943). However, these cases arose before the New Jersey Supreme Court had expressed its serious concern for adverse pretrial publicity and its ability to deny an accused a fair and impartial trial. State v. Van Duyne, 43 N.J. 369 (1964); In re Bailey, 57 N.J. 451 (1971). When faced with this problem this court placed reliance upon ABA Project on Standards for Criminal Justice, Standards Relating to Fair Trial and Free Press, § 3.5(f) (approved draft 1958), which states as follows:
(f) Questioning jurors about exposure to potentially prejudicial material in the course of the trial; standard for excusing a juror.
If it is determined that material disseminated during the trial raises serious questions of possible prejudice, the court may on its own motion or shall on motion of either party question each juror, out of the presence of the others, about his exposure to that material. The method of examination shall be the same as that recommended in section 3.4(a), above. The standard for excusing a juror who is challenged on the basis of such exposure shall be the same as the standard of acceptability recommended in section 3.4(b), above, except that a juror who has seen or heard reports of potentially prejudicial material shall be excused if the material in question would furnish grounds for a mistrial if referred to in the trial itself.
Section 3.4(a) contemplates examination of the jurors individually on the record, and section 3.4(b) sets forth the *19 standard of acceptability of a juror who may have been exposed to the offending article. During the late morning of Tuesday, May 28, 1974, the court personally questioned all 14 jurors separately in chambers in the presence of all counsel about their exposure to the article of the preceding week. Twelve jurors denied any knowledge of the article, stating in essence that they had carefully avoided reading any newspaper reference to the case. One juror whose next door neighbor knew he was serving on a murder case admitted having his attention called to the existence of the article by that neighbor. The juror asked his neighbor not to discuss the case or the article with him and did not learn the contents of the article. One juror acknowledged that her husband mentioned the article to her. She refused to discuss it with him and asked him to put the paper aside so she could read the story when the case was over. The court was convinced after questioning each juror that their responses were sincere and honest. Following the interviews, summations and charge took place and the jury deliberated from 5 P.M. until 9 P.M. on Tuesday, May 28, 1974. The court then ordered the jury sequestered in the custody of the sheriff's officers at a local hotel on Tuesday night. On Wednesday afternoon the jury returned the guilty verdicts. The court felt that once the jury was questioned about the article the better course was overnight sequestration in the event that the interviews aroused undue curiosity about the article in the minds of some jurors.
Unquestionably since Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), the courts have been extremely sensitive about pretrial and in trial publicity. Section 3.5(f) seemed an appropriate course to follow and was most pertinent to this problem. This approach was also used by Judge Wortendyke in United States v. Matale, 250 F. Supp. 381 (D.N.J. 1966), who stated on a motion for a new trial the procedure followed:
*20 During the course of the trial, defense counsel, out of the presence of the jury, brought to the court's attention press accounts of the progress of the trial, and contended that such accounts were prejudicial. The court thereupon interrogated each member of the jury, separately in open court, in the presence of the defendants and their attorneys, for the purpose of acertaining whether the newspaper reportings complained of had been read by the juror and, if so, whether the reading thereof had created any prejudice in the juror's mind. This interrogation completely satisfied the Court that nothing reported by the press respecting the trial was or could have been prejudicial to the defendants or any of them.
The fact of Locke's guilty plea described in the article, the proof at the trial that Locke was arrested in the alleged "get away car" with the Reddy defendants within an hour after the robbery, and the fact that both Reddy defendants exercised their Fifth Amendment right not to testify, certainly raised "serious questions of possible prejudice." If Locke had testified for either side his plea would undoubtedly have come out as bearing on his credibility at least. With Locke not testifying the potential impact of the newspaper article remained speculative at best until the jurors were questioned. As a result of questioning the jurors the court can readily agree with the commentary accompanying the ABA Standards, supra. at 145: "Reported decisions indicate that jurors will often answer candidly when carefully questioned and when the atmosphere is not conducive to intimidation."
Defendants' motion for a new trial because of the newspaper article revealing codefendant Locke's plea of guilty must be denied. The court is well satisfied from the interrogation of the jurors that none of them ever saw or read the article and the mere existence of the article does not in itself warrant a new trial, especially where the court is convinced factually that it played absolutely no part in the jury's deliberation leading to the guilty verdicts. The remaining grounds urged for a new trial are denied. The evidence was adequate to support the conviction and these were sufficient evidence from which the jury could find that defendants participated in the crime.