711 A.2d 1355

THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, AND THE NEW JERSEY STATE CONFERENCE, NAACP, ERIC O'NEAL; SEAN CARTER; ANTONIO MELENDEZ AND ROBERT GUZMAN, PLAINTIFFS–APPELLANTS, v. THE STATE OF NEW JERSEY, DEPARTMENT OF LAW AND PUBLIC SAFETY, DIVISION OF STATE POLICE, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued May 28, 1998—Decided June 22, 1998.

Before Judges KING, KESTIN and CUFF.

*Renee Steinhagen* argued the cause for appellants (Public Interest Law Center of New Jersey, Inc., attorneys; Ms. *Steinhagen,* on the brief).

*Sally Ann Fields,* Senior Deputy Attorney General, argued the cause for respondent (*Peter Verniero,* Attorney General, attorney; *Mary C. Jacobson,* Assistant Attorney General, of counsel; *Ms. Fields,* on the brief).

The opinion of the court was delivered by

KESTIN, J.A.D.

Plaintiffs appeal, on leave granted, from the portion of the trial court's order of November 19, 1997 which denied admission *pro hac vice* to David L. Rose and Joshua N. Rose, and from the order of January 9, 1998 which, on reconsideration, confirmed the ruling. The issue is whether the trial court correctly applied "countervailing considerations" to deny *pro hac vice* status to these out-of-state attorneys who it found had satisfied the "good cause" requirement of *R.* 1:21–2(a)(3) applicable in civil matters. We regard the showing of countervailing considerations to have been deficient, furnishing no adequate basis in the record for the trial court's determination. Accordingly, we reverse.

The amended complaint impugns recruitment and selection standards and practices of the Division of State Police (Division). It pleads unlawful discrimination in employment violative of federal law, 42 *U.S.C.* § 2000e–2 to –16 (Title VII), and the New Jersey Law Against Discrimination, *N.J.S.A.* 10:5–1 to –42. In addition to a general challenge, there are specific counts addressing the Division's requirement for a college education as a prerequisite for selection, and its use of an entry-level written examination, the Law Enforcement Candidate Record (LECR).

Shortly after issue was joined, plaintiffs filed a motion for *pro hac vice* admission of David L. Rose and Joshua N. Rose. The Division opposed the motion on the ground that there was an appearance of impropriety with respect to David Rose's involvement because he may have gained knowledge concerning the LECR during his employment with the U.S. Department of Justice. The motion judge then presiding over the case questioned whether David Rose had acquired proprietary information from the developer and publisher of the LECR, Richardson, Bellows, Henry & Co., Inc. (RBH). Plaintiffs were afforded an opportunity to file a supplemental certification addressing that question, but withdrew the motion instead.

Some five months later, a second motion was filed, seeking *pro hac vice* status for David L. Rose, Joshua N. Rose, and Richard T. Seymour. That motion came before a different judge. In apparent response to concerns expressed on the first motion, plaintiffs sought the *pro hac vice* admission of Joshua Rose and David Rose with respect only to the counts of the complaint containing the general allegations and those bearing upon the college education requirement. It was proposed that Mr. Seymour would represent plaintiffs in the attack on the LECR, and that David Rose and Joshua Rose would represent plaintiffs as to the balance of the complaint. The Division renewed its objections and, after oral argument and submission of supplemental briefs, the motion to admit Mr. Seymour *pro hac vice* was granted. The motion as to

David Rose and Joshua Rose was denied because of an appearance of impropriety.

Initially, the motion judge concluded in respect of both David Rose and Joshua Rose that the appearance of impropriety was sufficient to overcome the good cause justification for granting *pro hac vice* status, which had been satisfied. Upon reconsideration, however, the rationale of the ruling was modified. The motion judge determined that the finding regarding the appearance of impropriety did not apply to Joshua Rose, but that he could not be "screened out" from David Rose in that regard because "[t]hey're related. They share space. They work together." Accordingly, the determination to deny admission *pro hac vice* to both David Rose and Joshua Rose was reaffirmed.

We adopt the motion judge's recitation of the factual background:

From 1969 to December 1, 1987, David Rose was Chief of the Employment Litigation Section of the United States Department of Justice. In addition to his regular duties as Section Chief, Mr. Rose participated during the late 1970s as the Department of Justice representative on the inter-agency task force that drafted the Uniform Guidelines on Employee Selection Procedures now codified at 29 C.F.R. 1607. Part of his role in the development of the Uniform Guidelines was to review and conduct meetings with representatives of different organizations and groups that were interested in the Uniform Guidelines. At that time, Mr. Rose met with Frank Erwin, President of RBH, Inc., because of the role that Mr. Erwin played in supplying comments on various drafts of the proposed guidelines.

From 1981 through 1987, there was a marked change in the policies of the Justice Department, particularly with regard to the enforcement of anti-discrimination laws such as Title VII. Among the changes was a new policy adopted by the Assistant Attorney General for Civil Rights to work with employers in order to develop a procedure for the selection of police officers which was valid but had a less adverse impact than tests which had been traditionally used. In their efforts to identify valid police exams with less discriminatory effect, Mr. Rose and several attorneys in the Employment Section began to work with Mr. Erwin and his company, RBH, to develop a new generation of entry level police examinations.

The first meeting on the subject of whether RBH could develop a job-related police test took place on May 29, 1985. A second meeting took place on June 12, 1985, which consisted of a review of certain items in the autobiographical section of another RBH test, but of a type which was subsequently incorporated into the LECR. On July 30, 1985, another meeting was held at which Mr. Erwin presented information on the LECR's proposed development to representatives of the New Jersey State Attorney General's Office, the New Jersey State Police, the City of

Philadelphia, and Jackson, Mississippi. Additional meetings were held with Mr. Rose on February 10, 1986 and September 5, 1986. Mr. Rose and Mr. Erwin made a presentation on August 6, 1986 to the Public Safety Committee of the Suffolk County Legislature outlining a proposed consent decree under which Suffolk would participate in the LECR development program. In 1987, Mr. Erwin met with Justice Department personnel on January 15, March 4, May 27, June 16, July 2, August 5, September 25, October 13, December 1, and December 29. Mr. Rose attended at least two of these meetings, if not more. Mr. Erwin had subsequent contacts with Mr. Rose even after he left the Department of Justice in which LECR data was discussed.

Mr. Rose's role in the LECR project was to encourage employers like the New Jersey State Police to participate in RBH's validation studies for the development and use of police officers' examinations by allowing RBH to administer the experimental instrument to incumbent officers. Mr. Rose played no role in determining the contents or formulation of the examination or the conduct of the validity studies. After Mr. Rose left the Department of Justice on December 1, 1987, he had access to data that Mr. Erwin sent to him by mail, constituting the reports of RBH attempting to show the validity of the LECR and the adverse impact it had against African–Americans and Hispanics. Mr. Rose did not have a role in the formulation of those validity reports by RBH.

██ We concur with the motion judge's determination that both David Rose and Joshua Rose met the good cause requirement of the *pro hac vice* appearance rule by reason of their attorney-client relationships for an extended period with plaintiff National Association for the Advancement of Colored People (NAACP), *R.* 1:21–2(a)(3)(ii), if not also because the cause of action "involves a complex field of law in which [they are] specialist[s]," *R.* 1:21–2(a)(3)(i), or for other reasons "present[ing] good cause," *R.* 1:21–2(a)(3)(vi). The rule requires that only one of the stated justifications be satisfied. *L. Feriozzi Concrete Co. v. Mellon Stuart Co.*, 229 *N.J.Super.* 366, 368–69, 551 *A.2d* 987 (App.Div. 1988). The fact that David Rose has represented the NAACP regularly since his retirement from the United States Department of Justice in 1987 after some thirty-one years of service satisfies *R.* 1:21–2(a)(3)(ii). So does Joshua Rose's regular representation of the NAACP since 1988, shortly after he was admitted to practice. Joshua Rose joined David Rose in the practice of law in 1989.

██ We also agree with the motion judge that, as a general proposition, even where the good cause standard of the rule has

been satisfied, countervailing considerations may nevertheless preclude appearance as a discretionary matter, just as an attorney admitted to practice in New Jersey may be disqualified from representing a party to a lawsuit for good and ample reason. That discretion may not, of course, be applied arbitrarily. *Feriozzi, supra,* 229 *N.J.Super.* at 369, 551 *A.*2d 987.

The Division argues that special considerations not usually applied to an attorney licensed in New Jersey may inform a trial court judge's determination whether or not to grant a *pro hac vice* admission application. That argument may have some merit, to the extent that the lack of any ongoing connection with the jurisdiction, or distance, or some other realistic logistical concern, or some special element of personal history may cause the judge to form a reasonable apprehension that the applicant's attention to the case or the court will be deficient. Even with respect to such concerns, however, there are limitations on the judge's discretion. *Ibid.*

■ On the other hand, when issues of ethical dimension arise, such as the potential for a conflict of interests or other questions of professional duty, the rules are clearer-cut, and the trial court's latitude is more narrowly defined. Once the *R.* 1:21–2(a)(3) good cause standard for *pro hac vice* admission has been satisfied, either by one of the particulars contained in subsections (i) through (v), or by the general provision of subsection (vi), the trial court has no greater discretion to apply conflict of interests or other professional-duty disqualifiers to the out-of-state attorney than it does to the person generally admitted to the practice of law in this State. To allow broader discretion to disqualify an out-of-state attorney who has satisfied *pro hac vice* standards, under the general rubric of "countervailing considerations," would create an exception to the rule with the capacity to consume the standards upon which the rule is based. It would, furthermore, suggest a provincialism that cannot be tolerated.

In defending against plaintiffs' allegations concerning the LECR, the Division intends to rely on the testimony of Frank W.

Erwin, the president of RBH, the developer and publisher of the examination. It seems likely Mr. Erwin will testify both as an expert and a fact witness. The motion judge concluded that David Rose's former involvement with Mr. Erwin, RBH, and the development of the LECR creates an appearance of impropriety in respect of his representation of plaintiffs in this case. The rationale was succinctly stated:

> While the relationship between Mr. Rose and Mr. Erwin was not an attorney-client relationship and may not have given rise to an expectation of confidentiality between the two parties, Mr. Rose still had access to information that was relevant to the development and validity of the LECR as a result of his employment with the Department of Justice. Since the validity of the LECR is a pivotal issue in this case, Mr. Rose's knowledge concerning the development and validity of the exam presents an appearance of impropriety that could cast a shadow of doubt on the integrity and outcome of this case.
>
> Since Mr. Rose seeks admission to practice law in New Jersey for the duration of this litigation, he would be subject to the New Jersey Rules of Professional Conduct. Pursuant to *RPC* 1.11(a), "a lawyer shall not represent a private client in connection with a matter (i) in which the lawyer participated personally and substantially as a public officer or employee, (ii) about which the lawyer acquired knowledge of confidential information as a public officer or employee, or (iii) for which the lawyer had substantial responsibility as a public officer or employee." This rule prevents a lawyer from exploiting public office for the advantage of a private client. While the Court is not suggesting that Mr. Rose is attempting to exploit his former position with the U.S. Department of Justice for the benefit of the plaintiffs, Mr. Rose was involved in the development of the LECR as a result of his employment with the Department of Justice and may have gained information through that position that he may not otherwise be entitled to have. Consequently, plaintiffs should not be allowed to benefit from and defendants should not be disadvantaged by any information that Mr. Rose may have obtained as a result of his employment with the Department of Justice and his involvement with the development of the LECR in that capacity.
>
> The appearance of impropriety that is inherent in David Rose's representation of the plaintiffs is a countervailing consideration that outweighs the standards for admission *pro hac vice* set forth in *R.* 1:21-2. The Court is not satisfied with plaintiffs' attempt to rectify the situation by seeking to have Richard Seymour admitted so that he may represent plaintiffs with regard to the challenge to the LECR. The issues of the college degree requirement, the LECR, and the recruiting practices are so intertwined that it would be difficult to separate out the statistical or expert evidence, and discovery in the case would necessarily overlap. David Rose cannot be the counsel of record with regard to any aspect of this case.

A certification from Mr. Erwin was the only factual proffer submitted in opposition to the motion for *pro hac vice* admission.

It contains little beyond the background recited in the motion judge's opinion. We set out the certification in its essential entirety to emphasize its valuelessness in providing an adequate factual basis for the countervailing considerations which informed the trial court's denial after good cause had been established:

1. I am President of Richardson, Bellows, Henry & Company, Inc. (RBH), the developer and publisher of an entry-level police test known as the *Law Enforcement Candidate Record* (LECR) and presently in use by the New Jersey State Police.

2. The development of the LECR was initiated in response to a request by Mr. David L. Rose, then acting on behalf of the U.S. Department of Justice. My records show that the first meeting on the subject of whether RBH could develop a job-related police test took place on May 29, 1985. At that time and for a significant period prior to the meeting, Mr. Rose was Chief of the Employment Section of the Department's Civil Rights Division.

3. A second meeting took place on June 12, 1985, which I believe included Mr. Robert Moore, Mr. Rose's Deputy, and consisted of a review of certain items in the autobiographical section of another RBH test, but of a type which we subsequently incorporated into the LECR. On July 30, 1985, I attended a third meeting which was called by the Department and which Mr. Rose, Ms. Kay Baldwin, and Mr. John Gadzichowski attended. At this meeting, I presented information on the LECR's proposed development to representatives of the New Jersey State Attorney General's Office, the New Jersey State Police, the City of Philadelphia, and Jackson, Mississippi.

4. Additional meetings were held with Mr. Rose in the Department on February 10, 1986 and September 5, 1986. He and I also made a presentation on August 6, 1986 to the Public Safety Committee of the Suffolk County Legislature outlining a proposed consent decree under which Suffolk would participate in the LECR development program.

5. Additional meetings with Justice Department personnel were held in 1987 on January 15, March 4 (conference call), May 27, June 16, July 2, August 5, September 25, October 13, December 1, and December 29. Although there were likely more in which Mr. Rose participated, at least two of these meetings are noted as having been with Mr. Rose. Because of his earlier relationship to the LECR program, there also have been subsequent contacts since he left the Department in which LECR data were discussed.

6. In summary, given Mr. Rose's Justice Department involvement with the initiation and subsequent progress monitoring of the growth of the LECR program, he did have access to data involving the LECR, as well as Suffolk County and New Jersey State Police information, as we were encouraged to believe that we were working in a good faith relationship with the Department of Justice and senior career attorneys in its Civil Rights Division in developing a new selection instrument for law enforcement classifications.

These facts establish only that David Rose, while Chief of the Employment Section of the U.S. Department of Justice's Civil Rights Division, had been involved in events leading to the development of the LECR and that he met on a number of occasions with Mr. Erwin and others in the effort to present the evolving examination for potential use by various law enforcement entities throughout the United States, including New Jersey's Division of State Police. The certification also establishes that Mr. Rose had some access to some "data involving the LECR," but it nowhere states the nature of the information Mr. Rose obtained or whether it was more detailed or confidential than the information conveyed to others in law enforcement. The statements which conclude the certification add little. The characterization of Mr. Rose's involvement with the LECR and of the quality of Mr. Erwin's relationship with staff of the U.S. Department of Justice are net appraisals at best, with no factual detail to support them.

■ The record is, therefore, bereft of support for the conclusion reached by the motion judge that standards embodied in *RPC* 1.11(a) would be compromised if David Rose were permitted to represent plaintiffs. *See In re Onorevole*, 103 *N.J.* 548, 560–63, 511 *A.*2d 1171 (1986). The Erwin certification provides no factual basis from which a court might validly conclude that the extent of Mr. Rose's official involvement with the development of the LECR ten and more years before was sufficient to satisfy the personal and substantial participation standard of *RPC* 1.11(a)(1), or that he acquired any knowledge of confidential information with respect to the LECR, *RPC* 1.11(a)(2). The motion judge's conclusion that Mr. Rose "*may* have gained information through [his] position [and activities in respect of the LECR] that he may not otherwise be entitled to have," (emphasis supplied) also finds no concrete support whatsoever in the factual allegations contained in the Erwin certification. The motion judge's correlative conclusion that "plaintiffs should not be allowed to benefit and defendants should not be disadvantaged by any [such] information" is likewise

premised on the same conjectural "may," and is also lacking an adequate basis in the record.

The mere fact that Mr. Rose had a career in public service with the Department of Justice is, by itself, no basis for imposing a representational bar or otherwise impinging on plaintiffs' venerated rights to employ counsel of their choice, *see Leis v. Flynt*, 439 *U.S.* 438, 450–53, 99 *S.Ct.* 698, 705, 58 *L. Ed.*2d 717, 726–28 (1979) (Stevens, J., dissenting) (quoting lower court, 574 *F.*2d 874, 878–79 (6th Cir.1978)), even in a civil case. *See Jacob v. Norris, McLaughlin & Marcus*, 128 *N.J.* 10, 18, 607 *A.*2d 142 (1992); *Hauck v. Danclar*, 262 *N.J.Super.* 225, 228, 620 *A.*2d 479 (Law Div.1993); *Dwyer v. Jung*, 133 *N.J.Super.* 343, 347, 336 *A.*2d 498 (Ch.Div.1975). *See also Katchen v. Wolff & Samson*, 258 *N.J.Super.* 474, 610 *A.*2d 415 (App.Div.), *certif. denied*, 130 *N.J.* 599, 617 *A.*2d 1222 (1992). Our Supreme Court has emphatically rejected any notion of *per se* disqualification because of the appearance of impropriety for lawyers formerly in public service. *See In re Opinion No. 569*, 103 *N.J.* 325, 333–34, 511 *A.*2d 119 (1986) (quoting Kaufman, *The Former Government Attorney and the Canons of Professional Ethics*, 70 *Harv. L.Rev.* 657, 668 (1957)). It has, instead, established standards based upon the quality of the involvement and the interval between the governmental service and the proposed private representation. As to the former especially, the appearance of impropriety depends on the facts of each case. *Ross v. Canino*, 93 *N.J.* 402, 409, 461 *A.*2d 585 (1983) (quoting *In re Opinion 452*, 87 *N.J.* 45, 50, 432 *A.*2d 829 (1981)).

The nine-year hiatus between David Rose's employment with the U.S. Department of Justice and the filing of the *pro hac vice* application certainly suffices to mitigate any concern that this former officeholder might be seen to be taking advantage of information acquired in fresh governmental service. *See, e.g., Ross v. Canino, supra.* As we have already indicated, we view the factual showing in opposition to the motion for *pro hac vice* admission to provide no adequate basis for any finding that the

quality of Mr. Rose's involvement with the development of the LECR or any information he may have acquired was preclusive in respect of his representation of the plaintiffs. We note, as well, the absence of any indication in the record that Mr. Rose, during his tenure in office, represented any party whose interests he now seeks to oppose. Nor is there any adequately particularized proffer of fact from which we might conclude there was any likelihood that Mr. Rose received any information which would qualify as a protected trade secret or which might be the subject of any privilege conferred by law.

It is beyond question that the public's confidence in government requires safeguards against self-serving conduct on the part of former governmental officers which disserves the public interest. Equally significant public policies are at play on the other side of the coin, however. The Supreme Court emphasized them in quoting from Judge Kaufman's article:

> [T]he Attorney General expresses a valid concern over the effect that a period of post-employment disqualification will have upon his ability to recruit talented young attorneys to accept a government position. He already suffers the disadvantage of being able to offer them far less in salary than private law firms. We agree with Judge Irving Kaufman of the U.S. Court of Appeals for the Second Circuit, who expressed his concern almost thirty years ago on this same issue:
>
> > If the government service will tend to sterilize an attorney in too large an area of law for too long a time, or will prevent him from engaging in the practice of a technical specialty which he has devoted years in acquiring, and if that sterilization will spread to the firm with which he becomes associated, the sacrifice of entering government service will be too great for most men to make. [Kaufman, "The Former Government Attorney and the Canons of Professional Ethics," 70 *Harv. L.Rev.* 657, 668 (1957).]
>
> We recognize that government has a legitimate need to attract well-qualified attorneys and that by doing so the public is greatly benefitted. In fact, the public's perception of the legal profession may in fact be enhanced by not imposing unduly long periods of disqualification upon a former government attorney. *Id.* As Judge Kaufman wrote:
>
> > The appearance-of-evil doctrine is based on the desire to maintain a high regard for the legal profession in the public mind. This policy, I believe, will also be better served by not transferring the inferences applied to the private attorney to the government attorney. First, if the Government's efforts to recruit able lawyers are hindered by restrictive interpretations given to the Canons of Professional Ethics, it will reflect adversely on the entire bar and its public-service traditions. Second, when an attorney has acquired a knowledge of

government procedure and an understanding of the Government's viewpoint through employment with it, he will be of greater value to future private clients. This should be encouraged rather than discouraged. Third, since most attorneys in certain specialized technical areas of the law gained their initial experience with some government agency, an unrealistic application of the various disqualifying inferences might sterilize so many lawyers in those fields that it would be difficult for a litigant to obtain proper counsel. [*Id.*]

[*In re Opinion No. 569, supra,* 103 *N.J.* at 333–34, 511 *A.*2d 119.]

■ These policies, along with our substantial regard for any party's interest in counsel of choice, have an inescapable bearing on this case. The countervailing considerations that would justify denying the right to appear to a person who has satisfied the good cause standard for *pro hac vice* admission must be specific enough and sufficiently well-established by the record to support a finding that an ethical precept will be transgressed if the representation occurs; or that a palpable, articulable reservation concerning the individual's ability to provide adequate representation to the client and devote appropriate attention to the case is manifest, *see, e.g., In re Bailey,* 57 *N.J.* 451, 273 *A.*2d 563 (1971); *State v. Lanza,* 60 *N.J.Super.* 139, 142–43, 158 *A.*2d 355 (App.Div.1960). With individualized regard to David Rose and his long-past governmental service, we view the record in this matter to have provided insufficient support for the conclusion reached that such countervailing considerations exist here. Since the trial court found Joshua Rose to have satisfied the good cause standard of *R.* 1:21–2(a)(3) and not to be disqualified by any appearance of impropriety, but nevertheless denied his motion because of the practice connection with David Rose, it follows from our disposition relative to David Rose's motion that Joshua Rose's motion should be granted as well.

Accordingly, *pro hac vice* admission in this matter for the duration of its pendency shall be granted to David Rose and Joshua Rose conditioned upon their compliance with all pertinent rules of court and subject to the Supreme Court's authority over the practice of law. To the extent plaintiffs allocated responsibility for the various issues in the case among David Rose, Joshua Rose and Mr. Seymour because of the questions that had been

raised with regard to David Rose, our ruling disposes of that concern. Plaintiffs are free to reallocate responsibility for the issues among counsel as they see fit.

Reversed.